DA 20-0323

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 84N

IN THE MATTER OF:

J.E.S. and K.N.S.,

     Youths in Need of Care.

APPEAL FROM:    District Court of the Ninth Judicial District,
In and For the County of Glacier, Cause Nos. DN 16-21 and DN 16-22
Honorable Jon A. Oldenburg, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

         Daniel V. Biddulph, Peppertree Law, PLLC, Missoula, Montana

     For Appellee:

         Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

         Terryl T. Matt, Glacier County Attorney, Jennifer Stutz, Deputy County Attorney, Cut Bank, Montana

Submitted on Briefs:  February 24, 2021

Decided:  April 6, 2021

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 A.S. (Father) appeals from the termination of his parental rights by the Ninth Judicial District Court, Glacier County. On October 23, 2020, this Court ordered the separate appeals for J.E.S. and K.N.S. to be consolidated under this Cause Number.

¶3 On December 5, 2016, K. C. (Mother), an enrolled member of the Blackfeet Nation, gave birth to twin children, J.E.S. and K.N.S. (Twins), in Browning, Montana. Because of Mother's ancestry, J.E.S. and K.N.S. are "Indian child[ren]" under the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1903(4). While at the hospital, Mother reported that she and Father lived in Browning. Mother and Father were not married and, although returning to Cut Bank to reside for a short time, they eventually separated, with Mother's residential address becoming unknown and Father relocating to Great Falls, Montana.[1]

¶4 At birth, the Twins tested positive for methamphetamine, which was reported to the Bureau of Indian Affairs and subsequently forwarded by the Bureau to Montana's Department of Public Health and Human Services (Department). The Department

---

[1] Mother's parental rights were also terminated by the District Court, but she has not appealed.

immediately initiated these proceedings, notified the Blackfeet Nation, and placed the Twins in foster care.

¶5     On April 18, 2017, the District Court conducted a show cause hearing, at which Mother and Father stipulated to the existence of probable cause for removal, the adjudication of the Twins as "youths in need of care," and the designation of Kathy Calfbossribs, an ICWA coordinator for the Blackfeet Tribe, as the statutorily required ICWA expert for the proceeding.  On May 1, 2017, Mother and Father agreed to the Department's proposed treatment plans.  On January 8, 2018, the District Court extended the Department's Temporary Legal Custody over the Twins for an additional six months. The District Court adopted a Permanency Plan on April 3, 2018, with the goal of reunification upon Father's completion of the treatment plan.

¶6     In June 2018, citing lack of progress on treatment plans, the Department filed for termination of Mother and Father's parental rights.  Following a continuance on the termination hearing, Father made significant progress on his treatment plan, particularly in demonstrating sobriety, eventually leading the Department to suspend termination efforts. In March 2019, the Department placed the Twins with Father for a "trial" visitation period. However, Father was thereafter arrested on allegations of abusing K.N.S., and on June 11, 2019, the Department removed the Twins and placed them with their original foster placement.  On February 14, 2020, Father entered into a deferred prosecution agreement with the City of Great Falls, dismissing his charges without prejudice but acknowledging there was probable cause to charge Father with child endangerment.  Since removal of the children, Father has had virtually no contact with the Department.

¶7 The Department reinitiated termination efforts and on April 23, 2020, after a hearing, the District Court terminated Mother and Father's parental rights. The Twins were represented by an attorney, and each by a CASA volunteer. Father appeals, challenging the District Court's exercise of subject matter jurisdiction and its termination of his parental rights.

¶8 Under Title 41, chapter 3, MCA and 25 U.S.C. §§ 1901-63, this Court reviews a district court decision to terminate parental rights for an abuse of discretion. *In re M.T.*, 2020 MT 262, ¶ 16, 401 Mont. 518, 474 P.3d 820 (citing *In re S.R. and C.R.*, 2019 MT 47, ¶ 9, 394 Mont. 362, 436 P.3d 696). A trial court abuses its discretion when it exercises granted discretion based upon clearly erroneous findings of fact,[2] erroneous conclusions or application of law,[3] or acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice. *In re Marriage of Elder & Mahlum*, 2020 MT 91, ¶ 10, 399 Mont. 532, 462 P.3d 209 (citations omitted). "Whether a court has jurisdiction is a legal conclusion, which we review de novo." *In re Marriage of*

---

[2] M. R. Civ. P. 52(a)(6). Findings are clearly erroneous if not supported by substantial evidence, *Interstate Prod. Credit Ass'n v. Desaye*, 250 Mont. 320, 323, 820 P.2d 1285, 1287 (1991), meaning "evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Fiedler v. Fiedler*, 266 Mont. 133, 138, 879 P.2d 675, 678 (1994). We leave factual findings undisturbed if supported by substantial evidence, the trial court has not "misapprehended the effect" of the evidence, and the Court is not left with a "definite and firm conviction that a mistake has been committed." *Richards v. Trusler*, 2015 MT 314, ¶ 12, 381 Mont. 357, 360 P.3d 1126 (citing *Desaye*, 250 Mont. at 323, 820 P.2d at 1287) (brackets and quotations omitted).

[3] Reviewed for correctness. *Giambra v. Kelsey*, 2007 MT 158, ¶ 28, 338 Mont. 19, 162 P.3d 134 (citations omitted).

*Hardman*, 2019 MT 152, ¶ 9, 396 Mont. 238, 443 P.3d 1108 (citing *Capital One, NA v. Guthrie*, 2017 MT 75, ¶ 10, 387 Mont. 147, 392 P.3d 158).

*1. Whether the District Court had subject matter jurisdiction?*

¶9      Father argues the District Court lacked jurisdiction under § 25 U.S.C. 1911 because the Twins "domiciled or resided" within the Blackfeet Reservation at their birth.  The State responds that the District Court exercised concurrent jurisdiction permitted under the statute because Mother and Father resided in Cut Bank at the time of the Twins birth, and removal to Tribal Court was not requested.

¶10     State trial courts have subject matter jurisdiction over "all civil matters and cases at law and in equity."  *Gottlob v. DesRosier*, 2020 MT 210, ¶ 8, 401 Mont. 50, 470 P.3d 188 (citing Mont. Const. art. VII, § 4(1)); *In re K.B.*, 2016 MT 73, ¶ 12, 383 Mont. 85, 368 P.3d 722 (including child abuse and neglect proceedings).  "[A]fter a court has obtained jurisdiction, it retains that jurisdiction until the final disposition of the case."  *In re W.L.*, 260 Mont. 325, 329, 859 P.2d 1019, 1021 (1993) (citing 21 C.J.S. *Courts* § [88 (2016)]).  "Except as provided in [ICWA]," trial courts have subject matter jurisdiction over, *inter alia*, "a youth or youth's parent or guardian who resides in Montana."  Section 41-3-103(1)(d), MCA.

¶11     Like the Supreme Court of the United States, this Court has contrasted a Tribe's exercise of exclusive jurisdiction and Montana's exercise of concurrent jurisdiction in child custody proceedings involving Indian children:

> ICWA created a dual jurisdictional scheme for child custody proceedings involving Indian children.  25 U.S.C. § 1911.  Section 1911(a) establishes exclusive jurisdiction within tribal courts for child custody proceedings

5

involving an Indian child "who resides or is domiciled within the reservation." In contrast, *§ 1911(b) creates presumptively tribal yet concurrent state jurisdiction* over proceedings involving an Indian child who . . . is "not domiciled or residing within the reservation of the Indian child's tribe."

*In re S.B.C.*, 2014 MT 345, ¶ 23, 377 Mont. 400, 340 P.3d 534 (emphasis added); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36, 109 S. Ct. 1597, 1601-02 (1989). "In the case of an illegitimate child, that has traditionally meant the domicile of its mother." *Holyfield*, 490 U.S. at 48, 109 S. Ct. at 1608 (citations omitted).[4] *See also* 25 C.F.R. § 23.2 (stating that an Indian child born to unmarried parents relies on the "domicile of the Indian child's custodial parent" to determine the child's domicile).[5] Absent a showing of "good cause to the contrary" and "objection by either parent," trial courts are required to transfer any child custody or termination proceeding to the appropriate tribal court "upon the petition of either parent or the Indian custodian or the Indian child's tribe." 25 U.S.C. § 1911(b). Consequently, a state trial court has concurrent subject matter jurisdiction over

---

[4] For ICWA purposes, the term "domicile" is given a uniform construction and is "established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Holyfield*, 490 U.S. at 47-48, 109 S. Ct. at 1607-08 (citing *Texas v. Florida*, 306 U.S. 398, 424, 59 S. Ct. 563, 576 (1939)).

[5] Since the Twins were removed from the hospital upon birth, the extent of any exercise of legal custody by Mother for purposes of establishing domicile is technically nuanced. "Custody means physical custody or legal custody or both, under any applicable Tribal law or Tribal custom or State law. A party may demonstrate the existence of custody by looking to Tribal law or Tribal custom or State law." 25 C.F.R. 23.2. Under Montana statute, a parent-child legal relationship "may be established by proof of the mother having given birth to the child." Section 40-6-104(1), MCA. The "parent and child relationship" is defined as the "legal relationship existing between a child and the child's natural . . . parents incident to which the law confers or imposes rights, privileges, duties, and obligations." Section 40-6-102(1), MCA.

6

an Indian child domiciled outside of an Indian reservation until transfer of the proceedings to the appropriate tribal court is requested pursuant to ICWA.

¶12 In its order terminating parental rights, the District Court concluded that "[t]he Court has jurisdiction of this matter," without particular findings. The Department's original petition listed Mother's Cut Bank address as her domicile. In an affidavit supporting the petition, Tami Rae Young, the Department CPS, averred that Karl McLean, a CPS for the Blackfeet Tribe, contacted Young providing her with Mother's Cut Bank address and conveying concerns Mother was "trying to avoid CPS." After the Twins' birth, Young visited Mother and Father at the Cut Bank residence, where Father told Young they had recently moved. Notably, at the April 18, 2017 show cause hearing, Mother and Father stipulated to the petition's factual allegations that listed Mother's Cut Bank address as her domicile. Thus, it is apparent the District Court had an appropriate basis to exercise subject matter jurisdiction at the commencement of the proceeding, while not explicitly stated in the termination order.

¶13 Under 25 U.S.C. § 1911(b), the District Court was permitted to exercise jurisdiction until the parents or Blackfeet Tribe petitioned to transfer the case to tribal court. No party sought transfer. Contrary to Father's assertion that the Blackfeet Tribe asserted exclusive jurisdiction in its tribal determination letter, the Tribe merely acknowledged jurisdiction in this manner, but never sought to exercise it. Instead, the record demonstrates that the Tribe cooperated and participated directly with the state proceedings. For example, Calfbossribs, an ICWA Coordinator and member of the Blackfeet Tribe, testified twice as the statutory ICWA expert, first at the April 18, 2017 show cause hearing and again at the parental

termination rights hearing on April 20, 2020. Thus, it was not error for the District Court to exercise concurrent subject matter jurisdiction over this matter.

*2. Whether the District Court abused its discretion terminating Father's parental rights?*

¶14  Father first argues that the District Court erred in taking judicial notice of documents from his child endangerment criminal proceeding. The State argues that Father did not offer objections to the exhibit during direct examination and only a generalized objection later, and that, in any event, the documents provided factual information "not subject to reasonable dispute." Mont. R. Evid. 201(b).

¶15  At the termination hearing, Father stipulated to the admission of the Great Falls Municipal Court's order dismissing the prosecution without prejudice, while generally objecting to the admission of the primary incident report, remanding report, deferred prosecution agreement, and motion to dismiss without prejudice. Even though Father objected, specific grounds for that objection are not apparent from the context, nor did Father indicate that the District Court was precluded from taking judicial notice of the documents or that the District Court's decision potentially violated a statutory or constitutional provision. Generally, unless specific grounds are apparent from the context, "a timely objection or motion to strike [that] appears of record, stating the specific grounds of objection," is required to preserve an issue for appeal. M. R. Evid. 103(a)(1); *State v. Loh*, 275 Mont. 460, 479, 914 P.2d 592, 603 (1996) (requiring objections to specify the authority that would preclude a trial court from taking judicial notice or "what rule, statute, or constitutional provision might be violated by the court's decision") (citing *State v. Weeks*, 270 Mont. 63, 85, 891 P.2d 477, 490-91 (1995)). Even assuming a proper objection

8

had been made, we agree with the State that the District Court did not abuse its discretion in taking judicial notice of the documents. Father relied upon some of the information himself, including that he had entered a deferred prosecution agreement and the municipal court had entered the order dismissing the matter without prejudice.

¶16 Father's primary argument is that the District Court abused its discretion by terminating his parental rights, specifically, that the District Court erred in its findings and conclusions regarding his treatment plan, that his continued relationship with the Twins would likely result in continued abuse and neglect, and reunification would cause substantial harm to the Twins.

¶17 We first note that a presumption in favor of termination existed at the termination hearing. The Twins were then three years old and, except for a short time in the Spring of 2019, they had been in foster care their entire lives. Section 41-3-604(1), MCA, provides that "[i]f a child has been in foster care under the physical custody of the state for 15 months of the most recent 22 months, the best interests of the child must be presumed to be served by termination of parental rights." The presumption alone cannot justify termination and must be supported by findings entered under § 41-3-609, MCA. *In re D.B.*, 2007 MT 246, ¶ 23, 399 Mont. 240, 168 P.3d 691 (citing *In re B.H.*, 2001 MT 288, ¶ 29, 307 Mont. 412, 37 P.3d 736).

¶18 In termination proceedings, the best interest of the child receives primary consideration. Section 41-3-609(3), MCA. Under § 41-3-609(1)(f), MCA, if a child has been adjudicated as a "youth in need of care," a court may terminate the parent-child legal relationship if the parents have failed to comply with or successfully complete an

9

"appropriate treatment plan," and a "conduct or condition" that makes a person unfit to parent is "unlikely to change within a reasonable time." The statutory "conduct or condition" finding must show that it is likely "continued abuse or neglect" will result, or the parent is "unfit, unable, or unwilling to give the child adequate parental care," § 41-3-609(2), MCA, after considering various personal characteristics of the parent, § 41-3-609(2)(a)-(d), MCA (e.g., *inter alia*, emotional or mental illness).

¶19 We conclude from a review of the record that the District Court did not abuse its discretion terminating Father's parental rights. Father's treatment plan was designed to correct certain conditions and conduct that rendered him unfit to parent, including basic parenting skills, chemical dependency, mental health issues, housing, income, and general law-abiding behavior. Following Father's release from jail in mid-June 2019, Father made little or no effort to participate in the process, including contacting his attorney or CPS workers and his children through the Department. As the District Court found, Father "basically did nothing to assert any rights or show any desire to see his children." While the District Court did not base the termination of Father's rights on abandonment, as it had with Mother, Father's similar failure to engage his children was a significant fact. Additionally, while Father demonstrated some initial progress under his treatment plan, it was ultimately not successful. Upon the Department's return of the Twins to Father, as the District Court notes, "it quickly resulted in the endangering incident." Even though the criminal case was dismissed without prejudice, Father himself acknowledged that there was probable cause for the filing of the charges. The District Court concluded that Father "cannot and has not, sustained the necessary level of behavior and parenting to have

10

custody of the [Twins]," and "[i]t is far too risky to return the [Twins] to the care of the Father." We conclude that the District Court did not err in finding Father was out of compliance with his treatment plan, that his "conduct or condition" will result in the Twins' "continued abuse or neglect," and reunification will result in "serious emotional and physical damage" to the Twins.

¶20 Father also argues that Calfbossribs's testimony as an ICWA expert was insufficient to support the District Court's findings and conclusions terminating Father's parental rights. A "qualified expert witness is required to testify" that continued custody is "likely to result in serious emotional or physical damage to the child," § 41-3-609(5), MCA, "supported by evidence beyond a reasonable doubt." 25 U.S.C. 1912(f). At a minimum, termination requires testimony of an expert witness, but the "court's finding that a child will likely suffer serious emotional or physical harm if the parent continues custody does not have to be based on that testimony alone." *In re D.S.B.*, 2013 MT 112, ¶ 18, 370 Mont. 37, 300 P.3d 702 (citing *In re A.N.*, 2005 MT 19, ¶ 32, 325 Mont. 379, 106 P.3d 556). Here, the District Court considered Calfbossribs's testimony in conjunction with the other available evidence. Calfbossribs, an ICWA coordinator for the Blackfeet Tribe and stipulated expert witness, testified that the Twins would likely suffer serious emotional or physical harm if Father maintained custody over the children, specifically because of the alleged abuse by Father and the extensive period the Twins have been in foster care since their birth. The District Court found a causal relationship to exist between Father's conduct or condition (i.e., his parenting skills) that would likely result in serious harm to the Twins.

11

Thus, we conclude that the District Court's determinations were supported by sufficient evidence, including Calfbossribs's expert testimony.

¶21 Finally, Father argues the Department failed to make active efforts to reunite him with the Twins following the second removal. Prior to termination under ICWA, the court must be satisfied that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). "Active efforts" are circumstantial to individual cases and involve "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family." 25 C.F.R. § 23.2. We have stated that "a common sense understanding of 'active efforts' requires only that timely affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship." *In re M.S.*, 2014 MT 265A, ¶ 25, 376 Mont. 394, 336 P.3d 930 (citation, brackets, and quotations omitted).

¶22 The District Court found the Department made active efforts by, *inter alia* as extensively detailed in its findings of fact, supporting Father in completing his treatment plan by referrals, transportation, payment of expenses for visitation, and payment of drug testing, which initially resulted in reuniting Father with the Twins for the trial home run in March of 2019. Father does not challenge these previous efforts but faults the Department for failing to make active efforts after removal and filing for termination. But beside returning one call to the Department in August of 2019, Father did not engage or

communicate with the Department following his release from jail. We cannot conclude the District Court erred by finding the Department properly engaged in active efforts towards reunification.

¶23 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶24 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON